FILED & ENTERED

DEC 01 2021

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY egonzale DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>Yoram Talasazan<br><br><div align="right">Debtor(s).</div> | CHAPTER 7<br><br>Case No.:  1:16-bk-11671-MT<br>Adv No:   1:16-ap-01119-MT |
| Moeir Moussighi, Hanrit Moussighi, Moeir and Hanrit Moussighi dba Roll Tex<br><br><div align="right">Plaintiff(s),</div><br>   v.<br><br>Yoram Talasazan<br><br><br><div align="right">Defendant(s).</div> | **FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL** |

Yoram Talasazan ("Debtor," "Defendant," or "Yoram") and Moeir and Hanrit Moussighi dba Roll Tex ("Plaintiffs") entered into approximately forty agreements, between 2007 and mid-2010, for purchasing discount "fire sales" of garments for resale to retailers.  Plaintiffs' Trial Ex. 3, 4:4-6.  Debtor would locate potential merchandise, purchase it using Plaintiffs' funds, then store it in the warehouse of a business he operated, Ban-V, Inc., until a purchaser was located. When the goods were sold, profits

were to be split between Ban-V and Plaintiffs 60% - 40%, respectively. Id. at 3:18-4:3. As explained in the findings of fact and conclusions of law that follow, the profits were not split as agreed, and years of litigation ensued, resulting in this objection to discharge in Yoram Talasazan's Chapter 7 bankruptcy.

**Pre-Bankruptcy History of the Parties**

On September 20, 2011, Plaintiffs commenced litigation in the Superior Court of California, County of Los Angeles (the "Superior Court").  The First Amended Complaint in that case, case number BC459337 (the "State Court Action"), alleged (1) Breach of Contract, (2) Open Book Account, (3) Account Stated, (4) Unjust Enrichment, (5) Fraud, (6) Conspiracy to Defraud, (7) Negligent Misrepresentation, (8) Conversion, (9) Breach of Implied Covenant of Good Faith and Fair Dealing, (10) Assault, (11) Battery, (12) Intentional Infliction of Emotional Distress, and (13) Money Due on Dishonored Checks.

On October 11, 2013, the Superior Court entered its Statement of Decision (the "Statement of Decision," Plaintiffs' Ex. 3)[1], finding that Yoram failed to share proceeds with Plaintiff, cut off Plaintiff Moeir Moussighi's ("Plaintiff"[2]) access to the warehouse and key documents, and falsified documents to deceive him.  SoD, 5:13-15; 6:22-7:3. Yoram repeatedly issued checks from an account which he knew had insufficient funds and placed stop payments on other checks.  SoD, 5:15-17; 11:19-24.  The Superior Court found that Yoram's actions were done to deceive Plaintiff into believing that the money from sales of garments would be shared with him, and to induce Plaintiff to continue investing money with him in the garment deals. SoD, 7:1-3; 11:4-12:5; 12:22-24.

Yoram and his wife, attorney Noga Talasazan, were the only active shareholders and officers of Yoram's corporate entities, Ban-V, Inc. and Mika-El CLothing, LLC. SoD,

---

[1] Citations to the Statement of Decision are noted as "SoD," followed by the page and line number of that document. Exhibit references following SoD refer to exhibits introduced in the Superior Court trial that were also admitted in this trial as a group.

[2] The Court recognizes that both Moeir and Hanrit Moussighi are plaintiffs in this matter, however all actions taken on their behalf appear to have been taken by Moeir so where the singular "Plaintiff" or "Moussighi" is used, it refers solely to Moeir.

15:13-16.   The Superior Court also found that Yoram[3] used his and Noga's dominion of the two entities to divert assets to himself and his family to the detriment of his creditors. SoD, 15:1-7.   Yoram diverted assets from these entities to pay personal expenses, including Noga's State Bar dues, their children's summer camp and private school bills, and other personal household expenses. SoD, 15:7-12.  Yoram was also have found to have repeatedly taken money out of Ban-V's account in the form of checks written out to cash. SoD, 16:6-8.

A judgment was entered on August 4, 2014, in favor of Plaintiffs and against Debtor on six causes of action: breach of contract, open book account, account stated, unjust enrichment, negligent misrepresentation, and dishonored checks.  Thereafter, a judgment debtor examination hearing was held in the Superior Court on December 7, 2015, February 22, 2016 and April 5, 2016.  A hearing on alleged third-party ownership claims asserted by Noga and her sister, Shannon Lahiji, was scheduled for June 27, 2016.

**Bankruptcy and Adversary Procedural History**

On June 6, 2016, Debtor filed a voluntary chapter 7 petition.  On June 20, 2016, Debtor filed his schedules and the remaining case commencement documents, signed under penalty of perjury.  Bankr. ECF No.  10.  On Schedule A/B, he listed Lucki, Inc. as his company, 100% owned. He listed the debt owed to Moussighi on the Superior Court Judgment as secured on Sch. D.  On Schedule F, Debtor listed $406,710.84 in unsecured claims owed.  Debtor did not list Noga as a codebtor on Schedule H.  Yoram listed his occupation on Schedule I as "Sales" and under the heading "Employer" wrote Lucki, Inc., and a $2,000 a month income as "gross wages, salary, and commissions." Schedule I, Id., p. 24-25.  On Schedule J, Yoram claimed no expenses for rent or home ownership, on line 4.  Schedule J, bankr. ECF No.  10, p. 26-27.

In his Statement of Financial Affairs, Yoram included an empty safe deposit box at Wells Fargo Bank and stated that he does not have any interest in the contents of a safe deposit box at Chase Bank in Tarzana (the "Chase Box" or the "Box"), held in the

---

[3] In order to distinguish between Yoram and Noga Talasazan, they are sometimes referred to by their first names for greater clarity. No disrespect is intended. Where just "Talasazan" is used, it refers solely to Yoram.

name of Noga Talasazan.  Id., p. 33. He also listed the entities under which he did

business within the four years preceding the bankruptcy filing. His role as an officer of

Ban-V, Inc. was listed as terminating in 2012, and his role as an officer of Gygy

Fashion, Inc. as terminating in 2013.  Lucki, Inc., however, was listed as going concern

at the time of the bankruptcy filing. Id., p. 35.

On September 6, 2016, Plaintiffs filed an adversary proceeding against Debtor

objecting to discharge, adversary case 1:16-ap-01119-MT.  The initial complaint was

unclear on what specifically violated 11 U.S.C. § 523(a)(2)(B) and which parts of

§ 523(a)(4) were at issue. Similarly, there was insufficient specificity to support the

various 11 U.S.C. § 727 causes of action.  A ruling on the first motion to dismiss, ad.

ECF No.  7, resulted in dismissal of almost all claims with leave to amend under

§§ 523(a)(2)(B) and  (a)(4), and §§ 727(a)(2), (a)(3) and (a)(4). Ad. ECF No.  15. The

§ 523(a)(2)(A) claim remained. Ad. ECF No.  19. An amended complaint was filed

alleging violations of §§ 523(a)(2)(A), (a)(2)(B), (a)(4) and §§ 727(a)(2),(a)(3) and

(a)(4)(A).  Ad. ECF No.  17.  A ruling on the motion to dismiss the second amended

complaint resulted in dismissal of the § 523(a)(2)(B) cause of action, with the

§ 523(a)(2)(A) cause of action remaining, along with part of the § 523(a)(4) allegations.

The § 523(a)(4) cause of action was permitted to proceed based solely on allegations

sufficient to allege "fraud or defalcation while acting in a fiduciary capacity." The

embezzlement theory of § 524(a)(4) was dismissed. See ad. ECF No.  27, 7:17. The

amended complaint's allegations of §§ 727(a)(2),(a)(3), and (a)(4) also remained. Id.

A lack of agreement as to what was ruled on by the Superior Court and the

failure of Defendant to fully cooperate in discovery or the most basic procedural matters

resolving this dispute difficult.  Between the fall of 2017 and spring 2018, counsel for the

parties engaged in unproductive conflicts over the scheduling of depositions. See, e.g.,

Memorandum of Decision Denying Defendant's Motion to Compel, ad. ECF doc 47.

Defendant's last-minute cancellation of one deposition and inability to communicate

effectively to mutually schedule another date, muddied the litigation and caused unnecessary delay.[4]

These disputes continued until Plaintiff filed a motion for summary judgment on April 19, 2018, seeking summary judgment on the §§ 523(a)(2)(A) and (a)(4) causes of action, ad. ECF No. 54, followed by a cross motion for summary judgment by Defendant on April 25, 2018 on those same two causes of action, ad. ECF No. 60. Both motions heavily considered the issue of what the Superior Court ruled and argued which, if any, of those findings had preclusive effect.

On June 22, 2018, the Court denied Plaintiffs' motion and granted summary judgment to Defendant on the § 523(a)(2)(A) cause of action, finding that the Superior Court did not decide there was a fraudulent intent, the state of mind required for the fraud cause of action, so the Superior Court ruling found for defendant as to the fraud alleged under § 523(a)(2). Ad. ECF No.  83.  Although both sides sought summary judgment in their favor under the § 523(a)(4) cause of action in the amended complaint, Plaintiffs sought judgment under an embezzlement theory, which had been precluded by the ruling on the second motion to dismiss. Although the cause of action under § 523(a)(4) alleging fraud or defalcation while acting in a fiduciary capacity had been permitted to go forward, Plaintiff did not move for summary judgment on that cause of action.

Neither motion addressed what issues or factual findings the Superior Court made addressing the elements of fraud or defalcation as they related to § 523(a)(4).  In his motion, Defendant attempted to relitigate the issues found by the Superior Court by submitting declarations that contradicted some findings or inferences made by the Superior Court. Because Defendant did not show that these declarations could be

---

[4] The Superior Court findings also reference an extreme failure by both Talasazans in cooperating in discovery and preparation of exhibits for trial. The Superior Court found that "Defendants and their counsel, however, even after receiving Plaintiffs' detailed exhibit list and numerous emails and facsimiles from Plaintiffs' counsel warning of their failure to provide an exhibit list, intentionally refused to file and serve their exhibits list." The court also stated that "defendant and their counsel withheld multiple boxes of documents in discovery even after the court sustained a motion to compel against defendants and issued an order compelling the defendants and their counsel to produce all requested documents." The court also found that "most if not all of the documents within defendants exhibit book were never produced in discovery, even though requested" and that "defendants failed to turn over copies of the documents within the exhibit lists earlier in discovery." "Defendant also failed to bring the documents to his deposition." SoD, p. 17-18.

considered on the merits with no consideration of the Superior Court record, they were not considered.  Summary judgment was granted for the defendant on the § 523(a)(4) embezzlement theory, and the motion under § 523(a)(4) as to the fraud or defalcation theory was denied so that it could proceed to trial.

Defendant then sought summary judgment as to all the causes of action under § 727.  Ad. ECF No. 96.  On March 6, 2019, the Court ruled that the §§ 727(a)(2)(A) and (a)(4) causes of action could proceed to trial.  The issues that were permitted to go forward were the ownership of the home where debtor and his wife reside, the ownership of the contents of the Chase Box, a safe deposit box in debtor's wife's name, whether there were undisclosed cash transfers from debtor to others or another company within a year of bankruptcy, whether the debtor's prenuptial agreement was valid, and whether there were any false oaths about these issues.  Tr. of Oral Argument on Summary Judgment, 63:5 – 73:9, ad. ECF No.  121.  Judgment was granted to defendant on the § 727(a)(3) cause of action, the failure to maintain books and records.  Id. at 74:11-14; Order on Motion for Summary Judgment, ad. ECF No. 111.

From May through August 2019, the court had significant difficulty obtaining a joint pre-trial stipulation from the parties (see ad. ECF No. 108; 117; 126; 128; 131-134; 136; 139; and 140), but ultimately received one detailing disputed facts, witness and exhibit lists.  Joint Pre-Trial Stipulation, ad. ECF No. 137, August 16, 2019.  A 5-day trial commenced on September 12, 2019 and ended on October 4, 2019.[5]

Before turning to the claims tried under §§ 523(a) and 727(a), the Court will address several issues that affect all claims.

**I.   Expert Witness Testimony**

On April 1, 2019, the defendant filed a designation of Dr. Robert Manning Wilford V, a licensed Clinical Psychologist, as an expert witness to testify "about Defendant's mental disabilities of severe Attention Deficit/Hyperactivity Disorder (ADHD); Reading

---

[5] Having considered the testimony of witnesses, the documentary evidence received at trial, the oral and written arguments of the parties, the Statement of Decision in the Superior Court, and the other matters of record before the court, the court makes these findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable here by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

Disorder & Reading Disorder of Comprehension (RDR/C); Social Anxiety Disorder (SAD); Dyslexia; and Dysgraphia." Ad. ECF doc. 109.  It appears there was never any report or disclosure ever prepared or provided under F.R. Civ. P. 26(a)(2)(B) or (C), but no court order or stipulation concerning expert reports was ever issued under F.R. Civ. P. 26(a)(2)(D).  No deposition was ever taken of any expert. The notice explained that the expert would explain how defendant qualified "for special accommodations when performing tasks such as providing testimony such that Defendant's testimony is judged in a fair and equivalent way as compared to his non-disabled peers."

Under Federal Rule of Evidence 702, an expert may testify if, among other things, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to  determine a  fact in issue." Fed.R. Evid. 702. Trial judges are charged with the responsibility of acting as "gatekeepers" to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. See Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579,  589 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149 (1999).

After the close of Plaintiffs' case, Defendant opened his defense by calling Dr. Wilford to testify about Yoram's learning disability. Plaintiffs objected at trial to the admissibility of the testimony under F.R. Evid. 702, and the Court took the ruling under advisement pending a better understanding of why this testimony was relevant, permitting the testimony conditionally subject to the Court's later ruling as to whether it would be admissible and considered. Although it appeared that the testimony would explain why and whether any accommodations were to be given for Defendant's testimony, as explained below, no accommodations were ever specifically requested.

Dr. Wilford is a licensed clinical psychologist with a Doctorate in Psychology and seven years' experience operating a clinic for ADHD. He specializes in learning and mental disorders and has lectured and published studies on those topics in peer review journals.  Dr. Wilford's practice consists of 80-90% ADHD and coexisting conditions. He is qualified as an expert on these conditions if such testimony is admissible in the first place.

1
2
3
4
5
6
7
8
9
10

Dr. Wilford's opinion was that Debtor has a reading disorder, combined-type ADHD, a social anxiety disorder, dyslexia, and dysgraphia. These disorders make it hard for Debtor to read, cause him to switch numbers and letters and confuse dates. Dr. Wilford explained that Debtor gets anxious easily and cannot sit for long periods. It was Dr. Wilford's opinion that due to his ADHD, Talasazan "spaces out" easily, does not follow conversations, is hyperactive, restless, unable to sit still, cuts people off, and has an inability to wait.  He cannot recall well or put things in chronological order. Dr. Wilford stated that testifying in court is the worst place for social anxiety disorder and that this mental disability also affects the ability to testify at depositions. A witness will look like a "whack job," or will look out of sorts, or will try to cover or scramble physically and mentally.

11
12
13
14
15
16
17
18
19
20

Because of his disgraphia, Dr. Wilford thought that Debtor should not write paper records as they would be a mess and he should not touch anything with numbers or written records. He thought he would have difficulty recalling dates and sequencing. Dr. Wilford explained that items filed in the memory need to be new, novel, competitive or interesting or would not be retained. A person may appear to be lying but needs prompts instead. Dr. Wilford also explained that Debtor would have difficulty answering questions concisely, so not to give Debtor two-part questions. He believed Yoram "won't do well and would have difficulty forming agreements." When asked specifically about a prenuptial agreement, he hesitated and said Yoram would only have difficulty if it were something novel.

21
22
23
24
25
26
27
28

Dr. Wilford was charging his standard rate of $1,500 per day for testifying at trial. Between his trial witness fees and his earlier charges for the examinations and assistance with filling out citizenship paperwork, he has been paid about $4,500 total. Noga has paid all of his fees.  Dr. Wilford saw Debtor approximately one year before the objection to discharge trial, but years after the Superior Court trial. Talasazan had already gone through the first trial, several depositions, and a § 341(a) meeting of creditors and never raised any issue related to his disability.  Dr. Wilford was not aware of this adversary case when he was first consulted, and he did not read Yoram's deposition transcript as part of his preparation or forming his opinion as it was never provided to him.  He explained that he understands that Defendant was seeing him to

try to get accommodations for Court.  When the Court asked Dr. Wilford what the accommodations should be, he described putting Debtor in a private room with extra time and provide extra prompts.  Debtor should have less people present at his testimony and access to a calendar so he could recall dates.

Before he started testifying, the Court requested Defendant to say anytime he would like a break and asked him periodically during his testimony if he needed to take a break. He declined to take any. There were only four people in the courtroom -- two attorneys, the judge and the court recorder. The atmosphere was calm. A fifth person, Debtor's wife, Noga, may have been in the audience benches for some of the time. Neither Debtor nor his counsel requested to consult a calendar to keep dates clear. Any exhibits that were requested were placed before the witness in paper, and he took all the time he wanted to review them.  He appeared quite familiar with the records of the business. His recollection was good on anything his counsel asked, but he immediately claimed not to remember anything as soon as similar topics were raised by Plaintiffs.

The Court kept Dr. Wilford's testimony in mind throughout Defendant's testimony and ensured that neither side pushed too hard or asked questions in a compound or confusing way. Although a request for accommodations would have been adequate, rather than such lengthy testimony, to the extent that Dr. Wilford's testimony was necessary to provide a stage to consider the nature of Defendant's testimony, it has been considered.

Although the Court ruled that accommodations would be provided, there was no request for any specific accommodation made before Defendant testified. To the extent that the expert testimony really was to undermine the Superior Court findings, it is not admissible. The expert testimony was unpersuasive and improper as to anything related to the Superior Court case and exaggerated with respect to the testimony in this trial.

It was credible that Debtor has some learning disabilities. Although Dr. Wilford's testimony was permitted because it was relevant to how Talasazan might testify and what accommodations he might need, it became clear that Defendant presented this expert testimony primarily to impeach the Superior Court findings. The Superior Court had an opportunity to observe and rule on all the testimony and extensive documentary

evidence before reaching its conclusions. The Superior Court specifically commented on documents Defendant maintained himself such as his own ledgers, SoD, 7:23, and false invoices that he created, SoD, 7:1-3.  Dr. Wilford was provided with no background, no testimony and no copies of Superior Court rulings or transcripts.  His concern that Debtor could not recall dates or details was also inconsistent with Debtor's insistence on going through reams of invoices and records to try to show in some detail how wrong the Superior Court was.

## II.  Credibility/Admissibility Issues

On direct examination, Yoram's testimony was generalized, despite largely leading questions. Yoram's testimony on direct examination was smoothly delivered, just rocking a bit at times.  His recall was excellent, and his responses quick.  Defendant seemed completely comfortable testifying.

When questioned by Plaintiffs' counsel, however, Debtor's lack of recall was acute, especially when he did not want to remember adverse details.  On cross-examination, he became defensive quickly.  Debtor was able to provide lots of detail about certain exhibits when he wanted to and was evasive when pressed for other specifics. He was asked about any memory issues and whether it might cause any of his previous testimony to be inaccurate. He stated that most of time, it was accurate.

An illustrative exchange of Yoram's selective recall is when, during his cross-examination, Plaintiffs' counsel questioned Yoram about his previous testimony in Superior Court that his computer had burned up and that was the reason Debtor gave for why he could not give Moussighi access to his records.  Rather than answering the question, Yoram instead got very defensive, complaining about Moussighi and posing rhetorical questions that were then stricken as non-responsive.  When Plaintiffs' counsel posed the question again, Debtor professed twice that he could not recall whether that had been his testimony in Superior Court.

While Dr. Wilford attributed Yoram's likely lack of recall or potential "whack job" demeanor to his learning disabilities, there was no reason to believe these disabilities justified dishonesty and a failure to try to cooperate with the proceedings, locate

records, or attempt to recall for a moment before reflexively stating "I don't remember" immediately to questions posed by opposing counsel.

The Superior Court likewise found Yoram's testimony lacking credibility. In its Statement of Decision, the Superior Court stated "[w]ith respect to the credibility of witnesses, the court finds that Yoram Talasazan was not a credible witness as he was repeatedly evasive, testified contrary to his deposition testimony, and failed to adequately explain evidence presented against him." SoD, 19:14-23.

As a general matter for all witnesses, determining what testimony was honest, what was an exaggeration, and what may have been a failure of memory after so many years was a greater challenge than usual in this trial. Every witness raised a significant bias, memory, or honesty question. Assessments of such issues were important because of the diametrically opposed nature of some of the testimony. The testimony was all recorded and the Court has replayed much of it and compared it with the additional transcripts and documents admitted into evidence to reach the findings here.

Defendant tried to introduce testimony that would contradict the Superior Court findings, mainly through his own testimony, and that of Soraya Khalilipour. Between the constant interruptions and disputes between counsel, the lack of precision in both the questions and evidentiary objections, and the need to proceed through interpreters for much of the testimony, a subsequent review of all the testimony found many instances of testimony that should not have been permitted because they were direct attempts to relitigate the Superior Court trial. The Court has considered only the evidence that relates to issues that were not necessarily decided by the Superior Court. Additional evidence was permitted and was considered related to Defendant's intent and knowledge, to understand what damages are dischargeable and which deals and causes of action they related to, and to see what funds from the 2007-2010 business were still present in 2016 when the bankruptcy was filed.

**11 U.S.C. § 523(a)(4) - Defalcation while Acting in a Fiduciary Capacity**

A creditor seeking relief under § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity must establish three elements: (1) an express trust existed; (2) the

debt was caused by fraud or defalcation; and (3) that the debtor was a fiduciary to the creditor at the time the debt was created. Nahman v. Jacks, 266 B.R. 728, 735 (B.A.P. 9th Cir. 2001). "Defalcation is the misappropriation of trust funds or money held in any fiduciary capacity, or the failure properly to account for such funds." Id. at 737. Alternatively, it has been defined as "a failure to produce funds entrusted to a fiduciary." 4 Collier on Bankruptcy ¶ 523.10[1][b] (16th ed.).

Defalcation requires a "culpable state of mind ... involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior. Bullock v. BankChampaign, N.A., 569 U.S. 267, 269 (2013). Defalcation can encompass a breach of fiduciary obligation that involves neither conversion nor taking and carrying away another's property, nor falsity. Id. Defalcation while acting in a fiduciary capacity includes behavior that does not meet the standard of fraud in § 523(a)(2)(A). Id. at 275 ("defalcation," unlike "fraud," may be used to refer to *nonfraudulent* breaches of fiduciary duty).

## I.  Extent of the Preclusive Effect of the Superior Court Judgment

The following must be established in order for this Court to find that the Superior Court ruling established the required elements of Plaintiffs' § 523(a)(4) action: (1) the issue sought to be precluded from relitigation is identical to that decided in the former proceeding; (2) the issue was actually litigated in the former proceeding; (3) the issue was necessarily decided in the former proceeding; (4) the decision in the former proceeding was final and on the merits; and (5) the party against whom preclusion is sought is the same, or in privity with, the party to the former proceeding.  Harmon v. Kobrin (In re Harmon), 250 F.3d 1240, 1245 (9th Cir. 2001). Plaintiff bears the burden of proof for application of issue preclusion. Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 382 (9th Cir. BAP 2011).

There is no dispute that the Superior Court ruling was final and on the merits, and that the parties against whom preclusion is sought are the same parties.  The parties dispute whether the issues to be decided here are identical and whether they were actually litigated or necessarily decided.

A.  <u>The Defalcation Issue is Identical to that Decided by the Superior Court</u>

There were thirteen causes of action raised before the Superior Court, and six of these resulted in judgment entered in Plaintiffs' favor. The Superior Court found for Plaintiff on the following six causes of action: Breach of Contract, Open Book Account, Account Stated, Unjust Enrichment, Negligent Misrepresentation, and Money Due on Dishonored Checks.  The facts required to prove many of the elements of these causes of action overlap with what is required to prove defalcation while acting in a fiduciary capacity under § 523(a)(4).  While the elements of a state court action are rarely identical to those required for proving dischargeability under 11 U.S.C § 523, issue preclusion will apply to those facts found by the Superior Court. Where the findings are not sufficient to to be given preclusive effect, the Court is free to make its own findings to determine whether a debt is exempted from discharge.  The use of the term "defalcation" is not required for issue preclusion purposes. It is necessary only that the prior decision establish facts necessary to except the debt from discharge under § 523(a)(4).  <u>Pemstein v. Pemstein</u> (<u>In re Pemstein</u>), 492 B.R. 274, 2  (B.A.P. 9th Cir. BAP 2013).

i.  *Express Trust*

The first requirement for § 523(a)(4) is that an express trust existed.  <u>Jacks</u>, 266 B.R. at 736 ("In order for a fiduciary relationship to exist, the court must determine that the circumstances establish an express trust pursuant to state law.").  The Superior Court found the facts necessary to establish that an express trust existed, *i.e.*, that there was identifiable property that was entrusted to Defendant.  Specifically, in the SoD, the Superior Court finds that Moussighi invested funds in Talasazan's company, Ban-V, and that Talasazan was to share 40% of the profits with Moussighi.  <u>SoD</u>, 4:1-2.  In discussing the Greenwest deal, the Superior Court also found that Moussighi and "Talasazan were already partners in other deals and this deal was just the latest in a series of deals between them." <u>SoD</u>, 6:8-11.  At this trial, Talasazan did not dispute that Moussighi invested with him and entrusted funds to him.

1

2

ii.  *Debt Caused by Fraud or Defalcation*

3

Defendant's theory that the § 523(a)(4) claim must fail because the Superior

4

Court ruled against Plaintiff on actual fraud is incorrect. Defalcation while acting in a

5

fiduciary capacity includes behavior that does not meet the standard of fraud required

6

for § 523(a)(2)(A). A critical inquiry is what specifically in the Superior Court's decision

7

establishes whether defalcation occurred, particularly with respect to the scienter

8

requirement set forth in <u>Bullock v. BankChampaign, N.A.</u>, 569 U.S. 267, 269 (2013), the

wrongful misappropriation of funds. There must be express findings to support what is

9

required for defalcation under § 523(a)(4). <u>Harmon</u>, <u>Id</u>., at 1248.

10

The Superior Court made detailed findings in its 21-page SoD related to

11

Defendant's use of the company's funds and failure to pay Moussighi as follows:

12

(5:15-16) "Talasazan repeatedly issued checks from an account which
he knew had insufficient funds and placed stop payments on other
checks. (exhibit 41)."

13

14

15

(6:22-7:3) "[W]hile the merchandise was in Yoram Talasazan's
possession and under his control, 544,000 pieces disappeared and/or
were sold by Yoram Talasazan, without the proceeds being shared
with Moeir Moussighi or David Lahiji. Yoram Talasazan then presented
false invoices to Moier Moussighi to deceive Moeir Moussighi into
believing that money from the sales would be shared with Moeir
Moussighi."

16

17

18

19

(11:9-18) "[Y]oram Talasazan made several false statements of
material facts including that: a. the merchandise would be sold under
the name Rolltex; b. Moeir Moussighi would have full access to the
records and the warehouse; c. Yoram Talasazan would pay Moeir
Moussighi the amount of his investment prior to taking profits for
himself; and d. the checks being issued to Moeir Moussighi would be
honored by the bank."

20

21

22

23

24

(11:18-23) "[W]hen Yoram Talasazan made the statements, they were
untrue. Yoram Talasazan issued falsified invoices ..., issued checks
from bank accounts that he controlled knowing that insufficient funds
existed in the accounts to cover the checks, and even placed a stop
payment on some of the checks."

25

26

27

(12:15-23) "[Y]oram Talasazan made similar false statements under
the Greenwest deal. Yoram Talasazan suggested purchasing the
merchandise for the Greenwest deal and stated that it was a good
deal. Yoram Talasazan falsely represented that he had "pre-sold" the

28

merchandise and showed purchase orders for the "pre-sale." Yoram Talasazan showed Moeir Moussighi false invoices showing that payment for the "pre-sold" merchandise was payable to Rolltex (Moussighi's company)."

These findings established defalcation.

### iii. *Debtor was a Fiduciary at Time Debt Created*

In the context of nondischargeability actions under § 523(a)(4), "[t]he broad, general definition of fiduciary--a relationship involving confidence, trust, and good faith--is inapplicable." Ragsdale v. Haller, 780 F.2d 794, 796 (9th Cir. 1986). "The meaning of 'fiduciary capacity,' which is a matter of federal law, has been determined to apply only to express or technical trusts. In re Hemmeter, 242 F.3d 1186, 1189 (9th Cir. 2001) (citing Davis v. Aetna Acceptance Co., 293 U.S. 328, 333 (1934) (concluding that trusts arising by operation of law upon a wrongful act are not excepted from discharge)). California law makes all partners trustees over the assets of the partnership and, thus, California partners are "fiduciaries" within the meaning of the discharge exception for fiduciary fraud or defalcation. In re Davies, 494 B.R. 453 (Bankr. C.D.Cal. 2013.)  Under Ragsdale, id. and Cal. Corp. Code § 16404, the "joint venture" between Plaintiff and Defendant gave rise to a fiduciary relationship and all of the attendant duties thereof. Defendant was a fiduciary under California law at the time the debt was created. Talasazan's fiduciary duty arose at the time Moussighi entrusted his investment to him, and it predated the actions found to violate that trust. Pemstein, Id., at 281.

### iv. *Requisite Intent Required*

In Bullock, the Supreme Court was considering whether the bankruptcy term "defalcation" applies "in the absence of any specific finding of ill intent or evidence of an ultimate loss of trust principal.  Id. at 271.  The Court held that defalcation includes as an intentional wrong not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Id. at 273-274.  The Supreme Court explained,

> [W]e include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c),

p. 226 (1985). See id., § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include " 'wilful blindness' "). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." Id., § 2.02(2)(c), at 226 (emphasis added). *Cf.* Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, n. 12 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

Id. at 274.

Specific findings as to Yoram's state of mind were sprinkled throughout the SoD. With respect to the negligent misrepresentation cause of action, the Superior Court found that a requirement was that "although Defendant may have honestly believed that the representation was true, Defendant had no reasonable grounds for believing the representation was true when he made it." SoD, 10:21-25. The court then found that Talasazan made several false statements of material facts as discussed earlier, id. at 11:9-17, and that those false statements were made in order to induce Moussighii to continue investing with him. Id. at 12:1:2. The court's finding that Talasazan presented Moussighi with false invoices showing that payment for the "pre-sold" merchandise was payable to Moussighi's company, Rolltex, id. at 12:20-22, is the type of "gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation" described in Bullock. The findings of fact by the Superior Court established a culpable state of mind involving at least gross recklessness, if not knowledge of, the improper nature of Talasazan's conduct as a fiduciary.

B.  Issues Actually Litigated and Necessarily Decided

Under California law, an issue is actually litigated in the initial action when "it is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined . . . ." Gottlieb v. Kest, 141 Cal. App. 4th 110, 148 (Cal. Ct. App. 2006). As described earlier, the Superior Court found for plaintiff on six of the thirteen causes of action.  These causes of action were properly raised in the Superior Court complaint and argued at the Superior Court trial and appeal.  In the SoD, the Superior Court refers to facts supporting one cause of action as also supporting others, as the facts required to prove various claims naturally overlap.

An issue is "necessarily decided" when the issue's determination was not "entirely unnecessary" to the judgment in the initial proceeding.  Lucido v. Superior Court, 51 Cal. 3d 335, 342 (1990).  All the findings made in the SoD were necessary for the Superior Court to render its judgment. The findings supporting all causes of action were the passing of bad checks, diversion of inventory and falsification of invoices. While these activities support a breach of contract and negligent misrepresentation claim, they amount to defalcation as well.

Defendant argues that the Superior Court's finding of a breach of contract or negligence are insufficient to find a breach of fiduciary duty. While a breach of contract or negligence claim are not always a breach of fiduciary duty, the findings made by the court factually support a breach of fiduciary duty in this case. A negligent misrepresentation action also differs from a fraud cause of action under California law in that the scienter required is reduced from a knowledge of the falsity of the misrepresentation to a misrepresentation "without reasonable ground for believing it to be true." Goonewardene v. ADP, LLC, 5 Cal. App. 5th 154, 175, 209 Cal. Rptr. 3d 722, 741 (Ct. App. 2016), as modified on denial of reh'g (2016); Knight v. Aqui, 986 F. Supp 2d 989, 1001 (N.D. Cal. 2013). As the Superior Court found negligent misrepresentation, it necessarily found there was no reasonable grounds for defendant to believe he was operating in good faith.

Defendant also argues that a breach of fiduciary duty done on the good faith but mistaken belief that the action was not in breach does not meet Bullock's intentionality standard.  Defendant's position assumes a conclusion not supported by the facts found by the Superior Court.  Defendant's explanations were not believed by the Superior Court, which found "Talasazan was not a credible witness as he was repeatedly evasive, testified contrary to his deposition testimony, and failed to adequately explain evidence presented against him." SoD, 19:15-19.  Defendant made the same arguments concerning his good faith in this trial, and as explained in the next section, he confuses a desire to eventually repay the money owed with the knowledge with which he acted at the time he breached his fiduciary duties.

i.   *Trial Testimony Related to § 523(a)(4)*

In the Bankruptcy Court trial, Defendant went through Superior Court exhibits and sought to introduce additional evidence to show how the § 523(a)(4) defalcation cause of action was not proven in the Superior Court.  He testified that he intended at all times to pay Moussighi what he was owed. He testified that in order to try and satisfy what Moussighi said he was owed, he offered him interest in a building he shared with brother. Talasazan's testimony was that he "took a paper and said I'll give you this building right now until we are done with this debt and my half is yours." The bank, however, repossessed the building right after the offer was made.

Talasazan stressed that he gave Moussighi his client's invoices and let him be in the store with his mother-in-law to do collections for all cash. He told Moussighi to have patience because he planned to start "buying" again.  Talasazan maintained that he always respected Moussighi, who was like a father to him, and that he wanted to pay the invested money back but he just needed more time.  He also claimed that Moussighi told him to pay back only a percentage of the money, $3,880, every month, while they were in the midst of the deals, and that what was important to Moussighi was that he got interest.  His testimony was contradictory as to whether he intended to pay Moussighi or whether he believed Moussighi did not want all of his investment back.

Talasazan complained as well that Moussighi would say "Get me the money" and that he "abused" him.  The "abuse" appears to have been that Debtor attempted to explain that this was a business, and if Moussighi would give him time, Debtor would pay him, but Moussighi would not accept that explanation.  His testimony was focused on his belief that Moussighi caused him to go bankrupt and how Moussighi yelled at him and tried to make him "feel bad" for not paying him.

While Debtor clearly is distressed at the rupture of his relationship with Moussighi and the loss of the funds put into his business, an honest belief that he could pay it back eventually and a sincere desire to pay the funds back is not the same as the recklessness and dishonesty he showed at the time he took the money and operated the business. While Debtor may be correct that he also had business losses, that does not make up for his failure to provide any "accounting of the funds invested in the

partnership." Pemstein, id. at 282, and the misrepresentations he made to cover up the losses.

Soraya Khalilipour testified through an interpreter. She was an employee of Ban-V and Mika-El Clothing, doing secretarial work on invoices and shipments from 2008-2010. She worked on the inventory of goods for the companies and oversaw receiving. She is related to the Talasazans through Noga's mother. She also knew Moussighi from childhood as he is from the same area where they grew up in Iran. She also dealt with him all the years she worked with Talasazan.

She was asked to explain the background of the bad checks discussed by the Superior Court. See SoD, 5:15-17.  Yoram never gave her instructions to cut off access to Moussighi or to Ban-V's records during time she worked for Ban-V.  She saw Moussighi at the warehouse when she was a secretary most of the days he was there. Whenever they did a sale, Khalilipour testified that Moussighi would see it. She explained that she was in charge of writing checks for Ban-V and Mika-El but held no signatory authority.  Yoram would sign the checks she wrote.

Khalilipour did not remember if she ever gave Mika- El and Ban-V checks to Moussighi, so she could not really testify about the bad checks. She did state that she made cash payments to Moussighi from Mika-El. She gave him more than $60,000 cash for "expenses." She kept records of the money given to Moussighi and would get a signature. She opined that she did not get the impression that Yoram was trying not to pay Plaintiff because she would give money to both of them whenever she "gave money."

Khalilipour did not explain the false invoices provided by Defendant or the representation that clothing was "pre-sold" when it was not.  Her testimony confirmed how loose the accounting records were, how much business was done in cash, and how much of the business Debtor controlled.  In response to a question on cross examination about whether she was present during the Superior Court trial and in the audience the entire time, she suddenly had trouble remembering. She stated she did not testify in Superior Court trial about this because she was not asked. Khalilipour

admitted that she never testified to these facts when she could have at the Superior Court trial.

Talasazan admitted that he asked that $12,400 in checks be prepared for Moussighi but insisted that he intended there to be sufficient funds to cover them.  At the time they were issued, he represented to Moussighi that the checks would be honored by the bank. He also acknowledged that he knew that some checks were returned for insufficient funds and argued that it was only because Moussighi would pressure him to give him a check every two weeks.  He then told Moussighi to "hang on to the checks" and Talasazan would tell him when he could deposit the checks.  He complained that Moussighi did not listen and deposited the checks before there were funds to cover them.  Talasazan explained that he put stop payments on some of the checks because  Moussighi would "mess up" his account by cashing the checks even though he told Moussighi to wait until he sold the merchandise.  Thus, by his own testimony, Yoram confirmed at least part of the Superior Court finding that he knew the checks he presented to Moussighi were bad checks.

Defendant's testimony about his business practices and dealings with Moussighi mostly contradicts the Statement of Decision and adds nothing about the false statements otherwise found by Superior Court.  Debtor attempted to explain that Bobby Lahiji was Moussighi's client, and he may have been responsible for some of the loss, and wanted to introduce documents to support this argument that the Superior Court didn't allow him to proffer.  The Court did not permit this line of questioning. The individuals Defendant sought to blame were defendants in the Superior Court case, and the findings of who was responsible for the business losses had already been made after a full trial with all defendants in that case. He also tried to show that a landlord had taken substantial inventory because of unpaid rent, but the defenses to the inventory diversion were also considered by the Superior Court and could not be retried here.

 Defendant confirmed some of the Superior Court findings that Noga also received some money from his business.  Noga had her own ATM card and did work at Yoram's office in 2006.  Yoram explained that he got her the ATM card because he needed help from her.

Debtor demonstrated a failure to remember basic information when he wanted to about the issues in the SoD but did go through detailed exhibits of individual sales and explain how he did not get credit for them. He recalled specific deals and invoices and what handwritten abbreviated markings on many exhibits meant.  For instance, he testified that between 2008 and 2010, he could not remember if there were any years when he made more than $80,000.  He also represented that he did not remember the amount of product he sold between the years 2008 and 2010. The way he responded to Plaintiffs' inquiry about whether there was any year where he sold more than one million pieces, demonstrated that he did not even attempt to recall this information. He made no attempt to estimate information he had just discussed at length in his direct testimony. The additional evidence only confirmed Defendant did not take his fiduciary duties seriously and was often reckless with how he handled the funds entrusted to him.

Defendant sought to go through many invoices, payment records and bank statements to show where inventory and funds went. He had extensive writing in Hebrew and English on many of these documents, indicating how familiar he was with the details of each transaction. Defendant testified in this trial that he always allowed Moussighi into the warehouse, but the Superior Court had already found after testimony from him, Moussighi and others that he denied access to the warehouse.  SoD, 5:13. The records Defendant highlighted in this trial were only part of what the Superior Court considered.  It does appear that Talasazan also had business losses and the failure of the business affected him as well as Moussighi. This does not change the basic findings found by the Superior Court -- Defendant cannot blame the business losses on other people, he affirmatively misrepresented information to Moussighi, and he did not account for significant inventory.

Both the Superior Court and the additional evidence in this trial demonstrated that all requirements for Plaintiffs' § 523(a)(4) action have been met.

C.  Damages

Defendant argues that the full damages found by the Superior Court are not the appropriate damages for the § 523(a)(4) cause of action because the damages arising out of the breach of contract are not the same as those proximately caused by the

defalcation. A prevailing plaintiff under § 523(a)(4) must demonstrate actual damages on account of defalcation or fraud.  In re Banks, 263 F.3d 862, 870 (9th Cir. 2001).

The losses detailed by the Superior Court in the SoD were flowing from transactions known as the "Y Agreement" and the "YD Agreement".  The court found as part of the Y Agreement (Deals 1-38) that Yoram gave Moussighi false documents and stopped payments on checks he had given to Moussighi . SoD, 5:10-18; Trial Ex. 40; 41.  The losses were found to be $298,091 for those deals. This was the total of all 24 of the dishonored checks.  SoD, 14:5-9. These damages were found for breach of contract; open book, SoD, 7; account stated, SoD, 9; and negligent misrepresentation, SoD, 11-12.

The Superior Court also added a civil penalty to the $298,091 for the dishonored checks. The maximum penalty of $1,500 per check was imposed, totaling $36,000. Id., 14:11-13.

Another agreement known as the YD Agreement (or Deal 39) resulted in an additional $481,750 in damages.  SoD, 6:18 – 7:8; Ex. 42; 43-57; 58; 59; 61. These damages derived from merchandise under Talasazan's exclusive control, with the court finding that 544,000 pieces disappeared or "were sold." Id. In addition, the court found these damages were supported by false invoices to deceive Plaintiff.  Id., 1-4; Ex. 71-72. These findings were part of the basis for the causes of action breach of contract; open book, id., p. 8; and account stated, id., p. 10. The false statements discussed under those causes of action were also referenced under the negligent misrepresentation cause of action discussion.  Id., 11:9 – 13:5.  The earlier false statements were cited as a basis for Moussighi's continued investments with Talasazan, id., 12:17-25, and his "continued involvement with the joint venture." Id., 13:4.

Because no audit of the entirety of the companies' finances was presented by either side, there is no way to know if these amounts represent the profit that was not shared, the amount Talasazan took out from the profits for his personal use, or business losses. The court did find:

> Talasazan diverted assets from Ban-V, Inc. to himself and his family
> to the detriment of the creditors of Ban-V, Inc., and Mika-El Clothing,

1
2
3

LLC. This included paying his wife, Noga Talasazan's California State Bar dues from the funds belonging to Ban-V, Inc., children's summer camp bills, children's private school bills, buying[6] and remodeling the Talasazan home, and personal vehicle expenses."

4

SoD, 15:5-12.

5
6
7
8
9
10
11
12
13
14
15
16

Issuance of a bad check, in and of itself, is generally not a basis for a denial of discharge under §523(a)(2)(A).  See, e.g., Banner Oil v. Bryson (In re Bryson), 187 B.R. 939 (Bankr. N.D. Ill. 1995).  Where the bad checks are given as part of an ongoing course of conduct within a larger effort to lead the creditor on, or obtain further funds, they should be included as part of the overall damages. Huntington Nat'l Bank v. Marrufo (In re Marrufo), 2010 Bankr. Lexis 1608 (Bankr. D. AZ 2010).  Similarly, the mere issuance of a check that is subsequently returned for insufficient funds does not constitute a misrepresentation under 11 U.S.C. § 523(a)(2)(A), but issuing numerous checks for purposes of stringing the creditor along or lulling them into believing the funds were forthcoming is more than the issuance of a bad check. Zamora v. Jacobs (In re Jacobs), 448 B.R. 453, 476 (Bankr. N.D. Ill. 2011)(issuing bad paychecks for unpaid wages, along with promises to replace them, by employer who was an ERISA fiduciary was a violation of § 523(a)(4)).

17
18
19
20
21
22
23

The entirety of both sums, $298,091 and $481,750 for a total of $779,841 will be included as damages that are not discharged under § 523(a)(4).  The Superior Court explains in the SoD that the damages are as a result of 40 deals which were all part of the partnership, and they were all governed by the same terms and involved the same lack of access, deception and bad checks. Here, the manner in which the SoD lists the damages indicates that all of the damages were part of the course of conduct described by the court as a breach of fiduciary duty, so they all will be included.

24
25
26

The civil penalty of $36,000 is not included in the amount of the § 523(a)(4) judgment and will be discharged. A civil penalty is solely by virtue of the bad check

27
28

---

[6] Plaintiff has argued that funds were used to buy the Vanalden Property and this one line in the SoD does refer to it. The challenge the Court has is deciphering whether this SoD reference refers solely to money Noga was paid when she worked at Ban-V or whether there was other evidence introduced at the trial. Because no detail of any sort was ever provided either from the Superior Court trial or in this trial, there is no basis to conclude here that the Vanalden Property had any significant proceeds from Ban-V. All other evidence indicates that the Vanalden Property was purchased before Moussighi's investments started in Ban-V, indicating that this may be dicta confusing later mortgage payments with purchasing the Vanalden Property.

statute and does not arise specifically at the same time or as a result of the breach of fiduciary duty. <u>Anthony Wayne Credit Adjustors v. Clifton (in re Clifton</u>), 1996 Bankr. Lexis 1905 (Bankr. N.D. Ind., Sept. 3, 1996).

## 11 U.S.C. § 727(a)(2)(A) - Failure to Maintain Property of the Estate

The provisions denying a discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor. Courts have noted that "a total bar to discharge is an extreme penalty." <u>Ditto v. McCurdy</u>, 510 F. 3d 1070, 1079 (9th Cir. 2007), citing <u>Rosen v. Bezner</u>, 996 F.2d 1527, 1534 (3d Cir. 1993).  The reasons for denial of a discharge must be real and substantial rather than technical and conjectural. However, "[w]hile the law favors discharges in bankruptcy; it will not ordinarily tolerate the [debtor's] intentional departure from honest business practices where there is a reasonable likelihood of prejudice." <u>See</u> 6 <u>Collier on Bankruptcy</u>, ¶ 727.01 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.).

Those objecting to discharge "bear the burden of proving by a preponderance of the evidence that [the debtor's] discharge should be denied."  <u>Khalil v. Developers Sur. & Indem. Co. (In re Khalil)</u>, 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007), <u>aff'd</u>, 578 F.3d 1167, 1168 (9th Cir. 2009) (expressly adopting the BAP's statement of applicable law). "In keeping with the 'fresh start' purpose behind the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against the parties objecting to discharge." <u>Bernard v. Sheaffer (In re Bernard)</u>, 96 F.3d 1279, 1281 (9th Cir. 1996). This does not alter the burden on the objector, but rather means that "actual, rather than constructive, intent is required" on the part of the debtor.  <u>Retz v. Samson (In re Retz)</u>, 606 F.3d 1189, 1196 (9th Cir. 2010), <u>quoting</u> <u>In re Khalil</u>, 379  B.R. at 172.

The creditor must prove the following for a § 727(a)(2)(A) claim:

(1) the debtor transferred or concealed property;
(2) the property belonged to the debtor;
(3) the transfer occurred within one year of the bankruptcy filing; and
(4) the debtor executed the transfer with the intent to hinder, delay or defraud a creditor.

<u>In re Aubrey</u>, 111 B.R. 268, 273 (B.A.P. 9th Cir. 1990).

Plaintiffs' allegations in support of the § 727 claims are that Yoram concealed or transferred property of the estate by forming sham corporate entities to pay himself and transferred all of his assets to Lucki, Inc. and his wife, Noga, so that the assets would appear to be her separate assets under a Premarital Agreement (the "PMA").  The primary asset at issue is the family home, 5331 Vanalden, Tarzana, CA, at which Noga and Yoram have lived their entire marriage (the "Vanalden Property"). Noga testified that the house is 2400 square feet with 4 bedrooms, 3 baths,  and a pool, on a 15,000 square foot lot. Noga purchased it in 2002 for $450,000 and refinanced approximately a year later.  If the Vanalden Property were community property, all or part of it would be property of the estate under 11 U.S.C. § 541. In re Brace, 9 Cal. 5th 903, 910 (2020), 979 F.3d 1228 (9th Cir. 2020).

California law provides for separate property to stay separate after marriage unless the community makes payments on the property purchased by one of the spouses before marriage. In that situation, the payments must be traced and the community receives solely a *pro tanto* community property interest in such property in the ratio that the payments on the purchase price with community funds bear to the payments made with separate funds." In re Marriage of Marsden, 130 Cal. App. 3d 426, 436 (1st Dist. Ct App. 1982); In re Marriage of Sherman, 133 Cal. App. 4th 795, 802 (2d Dist. Ct. App. 2005).  While there is a rebuttable presumption under California law that all property acquired during marriage is community property, Cal. Fam. Code § 760, "there is a stronger rebuttable presumption that the terms of a conveyance accurately state the ownership interests." Wolf v. Jacobson (In re Jacobson), 2010 Bankr. LEXIS 5027, *30-31 (B.A.P. 9th Cir. 2010)(emphasis in original), citing In re Allustiarte, 786 F.2d 910, 915 (9th Cir. 1986). Under California law, the form of title presumption overcomes the community property presumption where there is evidence of spousal consent.

There is no dispute that title to the Vanalden Property is in Noga's name, and it was purchased before her marriage. At the time of trial, the mortgage on the Vanalden Property was approximately $600,000, according to Noga.  While it is now worth considerably more, no evidence of value was introduced. Yoram was in agreement that the Vanalden Property was Noga's. Plaintiffs' position is that Yoram should have

disclosed it on his schedules because it became community property at some point. Although the Superior Court referred to renovations being made to the Vanalden Property, no details were provided. Similarly, Plaintiff provided no evidence of specific renovations or tracing of what funds Yoram actually paid for the Vanalden Property.

## I.   The Premarital Agreement

In support of the community property allegation, Plaintiff relied primarily on his position that the PMA is a fraud, concocted after the judgment debtor examination hearing at which the Superior Court judge explained that Noga's assets may be community property and subject to judgment execution.  He argues that he originally sued Noga as well and then litigated for years, going through an entire trial with Noga still named as a defendant. Plaintiff argues that Noga, a licensed attorney, would have understood the importance of the PMA and yet the existence of the PMA was never raised, even when she claimed an exemption in the Chase Box when Plaintiff attempted to levy against the property contained therein.

A copy of the PMA was introduced at trial, and both Noga and Yoram testified about it.  No request was made before trial for the original to be produced, and the copy was admitted into evidence provisionally subject to the Court's decision as to its authenticity. It provides for any property separately owned to remain separate property after marriage, along with any increase in value of that property. Defendant Ex. G, p. 2. Yoram and Noga both disclosed their separate property in an exhibit to the PMA before it was signed. Yoram listed his ownership of all shares in Ban-V, Inc. along with a minimal bank balance. Noga listed her law office, the Vanalden Property and over $200,000 in various bank accounts. Noga also listed approximately $79,000 in student loan debt.  Both parties were represented by separate counsel. The agreement was signed on November 11, 2004. Id. p. 12. The parties attested to executing the agreement voluntarily and free from fraud, undue influence, coercion or duress of any kind. Id. at p.9.  They also acknowledged that either may devote considerable "time, skill, service, industry or effort" to the other's property, but that it would not create a community interest in that property. Yoram and Noga Talasazan were married in December 2004 and have been continuously married since then. They have two minor children.

There was some discussion at trial about Yoram filing for divorce. Yoram filed a petition for dissolution on October 15, 2015. (LASC Case no. LD072521.)  There was an answer by Noga a week later, but it does not appear there was much further action taken in the case until the case was dismissed on October 19, 2020. Plaintiff argued the PMA should have been disclosed at that time, but the preliminary form pleadings filled out by Yoram did not provide much detail. Noga and Yoram stated that they reconciled at that time, and any evidence of the PMA from that brief proceeding is inconclusive.

A. Burden of proof

Plaintiff argues that the burden of proof on the validity of the PMA is on Defendant because the default rule in California is that all property of either spouse is community property. California Family Code § 1615[7] details when a premarital agreement is not enforceable where a "party against whom enforcement is sought proves" either the agreement was not voluntary or it was unconscionable, among other things. It provides that Plaintiff has the burden here as he is the party "against whom enforcement is sought," *i.e.*, Moussighi is the party against whom Yoram is seeking to

---

[7] California Family Code § 1615 provides in relevant part as follows:
(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves either of the following:
      (1) That party did not execute the agreement voluntarily.
      (2) The agreement was unconscionable when it was executed and, before execution of the agreement, all of the following applied to that party:
            (A) That party was not provided a fair, reasonable, and full disclosure of the property or financial obligations of the other party.
            (B) That party did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided.
            (C) That party did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.
(b) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law.
(c) For the purposes of subdivision (a), it shall be deemed that a premarital agreement was not executed voluntarily unless the court finds in writing or on the record all of the following:
      (1) The party against whom enforcement is sought was represented by independent legal counsel at the time of signing the agreement or, after being advised to seek independent legal counsel, expressly waived, in a separate writing, representation by independent legal counsel. The advisement to seek independent legal counsel shall be made at least seven calendar days before the final agreement is signed.
      (2) One of the following:
            (A) For an agreement executed between January 1, 2002, and January 1, 2020, the party against whom enforcement is sought had not less than seven calendar days between the time that party was first presented with the final agreement and advised to seek independent legal counsel and the time the agreement was signed. This requirement does not apply to nonsubstantive amendments that do not change the terms of the agreement. . . .
      (4) The agreement and the writings executed pursuant to paragraphs (1) and (3) were not executed under duress, fraud, or undue influence, and the parties did not lack capacity to enter into the agreement.
      (5) Any other factors the court deems relevant.

Cal. Fam. Code § 1615 (2020).

enforce the PMA.  In addition, any objection to discharge under § 727(a) clearly places the burden of proof by a preponderance of the evidence on Plaintiff. <u>Khalil</u>, 379 B.R. at 172 .

B. <u>Validity of the Premarital Agreement</u>

There was no evidence presented of any of the factual circumstances identified in the statute that would support a finding that the PMA was not executed voluntarily or that the PMA was unconscionable at the time it was executed. Yoram had his own company and was running his business when he entered into the PMA.  Yoram's business was doing well enough for Moussighi to invest with him less than 2 years later. Yoram was also represented by counsel who assisted him in Hebrew, his native language. There is no duty here to scrutinize the process because the bargaining relationship was equal and Yoram had legal assistance, translation, as well as business acumen at that point.

Noga stated that she signed the PMA a month before her marriage and that she has the original. <u>Plaintiffs' Trial Ex G</u>. The PMA was signed in the Beverly Hills office of one of Noga's attorney friends. All of the signing parties were in the same room when it was signed.  Noga did not pay a retainer to the attorneys who handled the PMA, as they were friends so their handling the PMA was a favor.  When questioned about whether there was any documentation to support her assertion that the PMA was done as a favor, Noga replied that she did a search of her emails and found nothing.  Yoram paid his attorney, according to Noga, but she claimed she did not know the attorney he used. On cross-examination, she admitted she knew the attorney from before she met Yoram. They had a few dates a long time ago.

She remembered that she was asked for documents about the PMA in discovery and had no documents related to when the PMA was done 15 years ago. There was no ground to believe a retainer agreement or other communications about the PMA would have existed, given the relationship of the parties involved.  Noga was certain that Yoram understood the PMA because his attorney translated it for him. Yoram also seemed to understand the PMA at trial.

Her understanding is that the PMA dictated that her assets and debts are hers, and that Yoram's assets and debts will remain his.  She could not say whether the PMA dictates how expenses are to be paid.  Noga explained that the underlying issue in the Superior Court was breach of contract, which had nothing to do with the PMA.  After judgment was entered and collection activity began, Noga testified that she continued to believe Moussighi was going after her husband and not her. She appeared once in Superior Court for the post-judgment hearings or examinations ordered by the Superior Court in its *Order for Appearance and Examination* ("ORAP") pursuant to California Code of Civil Procedure Section 708.110, where she believed the issue was assets Yoram had.  When her assets were discussed, she complained that she was not a judgment debtor.  Noga testified that she never got a chance to speak, so she did not mention the PMA. Noga also testified that she does not remember the judge at the ORAP saying that unless she has a prenup, she must provide records.

Noga also described financial practices that Plaintiff argues contradict her position that the PMA created separate property interests after marriage.  For instance, Noga admitted to filing joint tax returns with Yoram every year until 2014, and that they jointly take the deduction for mortgage interest.  Noga explained that when they got a tax refund, whoever paid the taxes got the refund.  Yoram is a 1099 employee, so he pays his taxes at the end of year.  When questioned about this practice, Noga explained that the PMA provided for separate property but that the accountant said it would save money to file jointly.  Noga admitted that she and Yoram generally follow the PMA but act in contradiction to it, if it is in their economic interest to do so.

While she acknowledged that there was no mention of the PMA earlier in the litigation, she explained that she did not think it was relevant because the Vanalden Property "had nothing to do with Yoram." In the Claim of Exemption filed by Noga on April 21, 2016 in the Enforcement of Judgment Action, Noga stated: "I am not a party to this action. I am not the Judgment Debtor. The account I have is my property. It is held entirely by me. It is my separate account. There has been dissolution of marriage filed recently." Plaintiffs' Trial Brief re Prenuptial Agreement, Ex. A, ad. ECF No. 149.

Plaintiffs' position is that the PMA is a falsified document created within one year of bankruptcy, creating a transfer of what was once community property that would be part of the bankruptcy estate under § 541, with the intent to hinder, delay or defraud a creditor.  Thus, to enforce the PMA against Plaintiff would be unconscionable.  Plaintiff offered the testimony of Peggy McGinn.  McGinn, who retired after serving as a mediator for Los Angeles Superior Court for 32 years in civil and family law cases, was called to impeach Noga about statements she contends Noga made regarding the PMA.  McGinn stated that she was in court during post-judgment ORAP hearings "many" times during the first four months of 2016. McGinn described the interior of the courtroom, drawing a diagram of where everyone was during a certain ORAP hearing. See Plaintiffs' Trial Ex. W.  McGinn noted that Eli Petel ("Petel") was in court with Yoram, and Noga appeared after the ORAP.  McGinn thought there were about six people standing in front of the bar, while she was sitting behind the bar.  Aside from those named, McGinn did not know the parties who attended the ORAP examination with Defendants.

Talasazan was allegedly uncooperative during the ORAP examinations.  McGinn described Yoram's initial failure to bring requested documents and explained that the Superior Court judge ordered him to bring back the documents, specifically directing them to present their regular household bills.  According to McGinn's testimony, Noga's counsel was objecting to her finances being pulled into the ORAP hearing. McGinn observed that when the judge said something about Yoram and Noga comingling their assets, Noga explained that her and Yoram's bank accounts were separate, to which the Superior Court judge replied, according to McGinn, "[n]ot based on what I'm looking at."  Further, when the presiding judge said "I'm sorry. Unless you have a post-nup or prenup, you'll have to turn the financial information over," McGinn testified that Noga looked at her attorney and said in a high whisper, "[w]e have to get one of those." McGinn testified to this alleged statement in her deposition as well.  Deposition of Peggy McGinn, Nov. 1, 2017, 63:9-10; 16-17.

Petel was called by Defendant to discuss what occurred at the ORAP hearing and McGinn's statement about the prenuptial agreement. Petel explained that he was involved in assisting Talasazan with this legal dispute.  He maintained that his

assistance was done just out of friendship and that he had no business dealings with Talasazan. He speaks Hebrew, so he helped Yoram because Yoram does not speak English well.

Noga and Yoram, their rabbi and his wife, and Petel were all present at the ORAP examination. Petel testified that these five people all spoke Hebrew; some spoke English but mostly spoke in Hebrew.  Petel explained that when they spoke both inside and outside the courtroom, they did so in Hebrew for sake of keeping their conversation confidential.  Petel did not specify whether these parties spoke with Noga's and Yoram's attorneys in Hebrew.

Petel stated that he was there for the entire ORAP hearing while the judge was examining Yoram. Petel testified that the judge never made mention of a premarital agreement and that he is sure that he never heard Noga say "I've got to get one of those." After the hearing, Petel walked out with both Talasazans and was with them the entire time, speaking with them in Hebrew.

Plaintiffs note that not one attorney present at the ORAP hearing said that there was a premarital agreement or gave a copy of it to the Superior Court at that hearing. According to McGinn's testimony, the Talasazans were ordered to submit several documents to support their position that they held their assets separately. It is plausible that Noga and her attorney would not believe that the then-13-year-old document was necessary to bring to the ORAP.  The relevance of their PMA was not made apparent until the hearing when the Superior Court judge explained what documents the Talasazans would have to submit, including a pre- or post-nuptial agreement.

Despite Plaintiffs' argument that the PMA came out of nowhere after this hearing and should have been mentioned numerous times earlier, it is not clear it was relevant to anything before the attempts to collect the judgment from Noga.  Noga was a defendant in the Superior Court action, so a PMA would not have shielded her at any point before the Superior Court found her not to be liable.  A PMA is generally litigated in a dissolution proceeding, but the divorce action was dropped shortly after initial pleadings.

McGinn's testimony is possibly colored by bias caused by her financial stake in the outcome of this case or, more likely, she may not have heard correctly.  McGinn explained that she typically gets a percentage of the recovery for any judgment debtor where she does the investigation.  Her contract with Plaintiff provided for such compensation.  She testified that she has two agreements with Moussighi with respect to helping collect his judgment but would not provide those agreements.  The agreements with Moussighi were lost when her computer crashed and she could not locate a hard copy. She also refused to disclose who the parties were to those agreement(s).

McGinn was also likely not in a position to clearly hear exactly what was said. Her testimony about the "high whispered panic" she alleged Noga used to say in English "I've got to get one of those" in the ORAP hearing room and/or in the hallway outside the hearing room makes less sense than Petel's testimony.  It is implausible that Noga as a licensed attorney would make such a inculpatory statement in or around the hearing room, in English, in proximity to strangers or party opponents.  Petel's testimony of the same events was credible, and it makes more sense that these parties would use Hebrew to communicate.

The facts support Noga's testimony as relates to the circumstances of creation of the PMA even though her testimony in general was extremely coached and biased.  Her financial status at the time of her marriage shows that she had substantial assets that were held in her name, including the Vanalden Property.  It is reasonable that Noga, an attorney when she married, would have wanted a PMA executed prior to her marriage to protect assets that may have been Lahiji family assets, obtained before marriage.  It is also plausible that Noga said "I've got one of those" when the judge mentioned that a prenuptial agreement would need to be provided to avoid turning over her records. This position is consistent with her other statements in the collection action.

Plaintiffs offered no additional evidence at trial, beyond McGinn's testimony, to support his theory that Yoram and Noga fabricated the PMA after the ORAP hearings. Although they were listed on the witness list, Plaintiffs did not depose or subpoena the two attorneys who signed the PMA, as representatives of Noga and Yoram,

respectively.  No document examiner or handwriting expert was called to testify about the document. Plaintiff argues in support of his forgery theory that the PMA was never recorded or notarized, but there is no requirement under California law that a PMA be recorded or notarized for it to be valid.

Plaintiff argues that Noga's status as an attorney should demonstrate that she would have understood the import of the PMA earlier in these proceedings.  It is also just as likely, however, that having assets in separate accounts demonstrates her understanding that the PMA created separate property interests.  In Part 7 of the PMA, the parties agreed that any earnings or efforts by the spouses that may have created a community interest (in the absence of the PMA) will not create such community interest, and any income and increase in value to the separate property that may have created a community interest (in the absence of the PMA) will not create such community interest.

The PMA was executed prior to the Talasazan marriage and became effective upon the marriage in 2004.  Cal. Fam. Code 1613.  Because the PMA was effective as of the date of the marriage, Yoram had no community interest in Noga's bank accounts, the Vanalden Property or any appreciation in the value thereof, or in Noga's earnings from her work as an attorney. Therefore, under the standard for § 727(a)(2), Yoram did not conceal those assets when he completed and signed his bankruptcy schedules.

In terms of collection of the judgment, Plaintiff argues that the facts of this case provide grounds for this Court to find the prenuptial is not enforceable against him under Cal. Fam. Code § 1615(c)(5). Plaintiff also relies on a law review article, Carroll, The Superior Position of the Creditor in the Community Property Regime: Has the Community Become a Mere Creditor Collection Device?, 47 Santa Clara L. Rev. 1, 11-12 (2007).  See Plaintiffs' Trial Brief re Prenuptial Agreement, ad. ECF No. 149, p. 4. He argues that enforcing the PMA against a creditor who was not a party to it and had no notice of it is unconscionable. The article relies on law from Idaho, Nevada and Louisiana but provides no basis for Plaintiffs' position under California law, and the Court could find none.

Plaintiffs maintains that § 1615(c)(5) "clearly gives the trial court the power to review 'any other factors the court deems relevant' in determining the enforceability of a

prenuptial agreement" and identifies subsections (a); (b); and (c)(5) of § 1615 as the basis for this discretion.  This Court could find no support for finding the PMA unconscionable or for disregarding the PMA because of filing joint tax returns and taking a deduction for their mortgage payments. Shared payment of child and household expenses also do not invalidate a PMA.

Plaintiffs misread § 1615.  There are two ways to make a showing under § 1615 to invalidate a prenuptial agreement: one, prove that it was not entered into voluntarily, as provided for under § 1615(a)(1); or two, prove that the agreement was unconscionable when it was executed for one (or more) of the three circumstances provided for under § 1615(a)(2)(a) – (c).  Section (b) merely provides that an issue of unconscionability of a prenuptial agreement is decided by the court as a matter of law. Section 1615(c) clarifies subsection (a) by outlining the four findings a court is required to make when it finds that a premarital agreement was not executed voluntarily. Subsection (c)(5), on which the weight of Plaintiffs' argument rests, is a fifth, catch-all provision that permits the court to consider any other factor it deems relevant when deciding whether a prenuptial was executed voluntarily, not whether a prenuptial agreement should be invalidated against a third-party.

Whether Yoram and Noga's practice of performing under the PMA when it is financially beneficial for them to do so, and eschewing the PMA when it benefits them, is grounds to make the PMA unenforceable against Moussighi is not an issue that this Court of limited jurisdiction need determine. In addition, the evidence of commingling of assets and expenses or community contributions was extremely scattershot and confusing, making it impossible to factually conclude anything on that specific issue in this trial. Any argument that the PMA should be ignored for collection of the nondischargeable judgment must be made in Superior Court as part of any collection efforts with additional evidence provided. The judgment here is based on the limited findings required to resolve the claims under §§ 523(a) and 727(a), respectively. Hamilton v. Elite of Los Angeles, 584 B.R. 310, 323 (B.A.P. 9th Cir. 2018), aff'd, 785 F. App. 438 (9th Cir. 2019) (bankruptcy courts determine solely the existence and amount of the debt and to what extent it is dischargeable.)

**II.  Property Ownership and Joint Expenses**

Plaintiffs stressed how much Defendant spent during the time he operated and sought inferences that concealed assets were now funding a lavish lifestyle.  The proof on this was simply not there to support the inference that the Talasazan's expenditures consisted of funds secreted away from Yoram's joint ventures with Plaintiff.  It appears that during the time Ban-V was either turning a profit or had Plaintiffs' funds to use, the Talasazans did fund average cars to drive, private school tuition and some house repairs. The Statement of Decision also refers to 2007 to 2011 expenditures, and they were not detailed in any way, so the expenditures detailed there are not relevant to income and expense statements made in a 2016 bankruptcy.

Noga stated that in 2015, she reported as her total income $70,000 (just over $5,800 gross per month), and that her household expenses in 2015 were $5,000 per month.  They have no joint bank accounts and Noga's health insurance does not cover Yoram; she pays for the insurance for just for her and the children. With the mortgage of $3800 and $1400 per month for the two minor children's Orthodox Jewish school tuition, Noga testified that the entire Talasazan monthly expenses together were approximately $6,500 at the time the bankruptcy was filed.

The Talasazans expenses appear to have been paid from the ongoing income of both Noga and Yoram over the years, but there was no specific false statement on the schedules to derive from this.  Plaintiffs questioned whether Yoram had ever made mortgage payments, or had any other interest in the Vanalden Property. Noga identified a period of time between 2005 and 2006 – right after they had married – in which she did legal work for Yoram's entities. She explained that, in exchange for her work for Yoram's separate property entities, he paid the mortgage for this period where Noga was working less.

The only real property that Plaintiffs tied to Yoram was an investment in a building he co-owned with his brother, near 14th Street and Santa Fe Ave, in Los Angeles (the "L.A. Building"). Decl. of Yoram Talasazan, 61:21.  Yoram testified that his brother offered him a chance to invest a building that was purchased for approx. $1.2 million a couple of months after he got married.  Id. at 61:2.  He explained at trial that he

qualified for the purchase loan through his brother Hertzel, who completed the loan application and Yoram then signed it. He and his brother only owned the building for a few years before it was lost through foreclosure.

At some point, there was an SBA loan secured by the property. Both Yoram's trial testimony and his deposition testimony demonstrate that he is somewhat confused about how his brother structured the financing of the debt to the SBA, but he asserts that the debt to the SBA is still owed and was listed in his bankruptcy schedules. Yoram did not remember whether he included information about the PMA in the loan applications related to the L.A. Property. Yoram's brother handled issues related to the building. Yoram admitted that he failed to contact his brother to get a copy of the loan application when he was requested to do so, and that he does not recall what he said about the L.A. Building in his deposition. In any case, the L.A. Building was not owned at the time the bankruptcy was filed.

On Schedule J, Yoram included monthly expenses of $700 for "food and household supplies," $300 for "child care and education," and $150 for "clothing, laundry, and dry cleaning." Schedule J, p. 27. While his schedules reflect that he does not contribute to the mortgage expense, he does attest to contributing $1,150 to the household. Yoram's claimed financial contribution to the Talasazan household expenses, in addition to Noga's contribution of her gross income of $5,800 per month would garner approximately $6,950 gross. After taxes, their income contributions would have been just enough to cover the expenses, with any shortfall covered by Noga's family or friends, according to her testimony. There was testimony about their tax returns and income, bank records introduced and allegations of hidden income. While it is certainly possible there is some unreported cash, it does not appear it was any significant amount. In any case, the amount of undisclosed income or secreted cash was not supported by the evidence.

A. The Chase Safe Deposit Box

Another asset that Plaintiff identified as one he believed consisted of concealed funds was the Chase Box, held in Noga's name. Noga testified that the Box held her

personal jewelry and gifts, but no loose diamonds. She further testified that she has no idea what her personal jewelry may be worth, as she has never had any of it appraised.

Noga testified that the cash in the Box belongs to her father and that the funds were proceeds of the sale of her father's business in Iran, which occurred sometime in 2013. Noga explained that, sometime in 2013, after the sale of his business, her father entrusted her to hold the money and instructed her to use it to pay for her sister's wedding and dowry.  Noga claimed that the cash belongs to her father, not her sister Shannon Lahiji, though it is held for her benefit.

Noga testified at trial that collection activities had started before the Chase Box was opened on March 30, 2015.  Defendant's Trial Ex K.  Ostensibly unaware that keeping large sums of cash in the Box was against Chase policy, Noga explained that she kept the funds in the Box because she felt that was safest way to store the money her father set aside for her sister's wedding.  Because the money is her father's, Noga testified that she would not put those funds in an account in her name and that she never took money out of Box. Noga stated that Yoram had no access to the Chase Box and never came into the room when she accessed it; Yoram accompanied her to the outside area near the Box only once, when they were going to or coming from an event and she needed to retrieve a piece of jewelry.

When questioned about the declaration filed by Shannon in support of her claim of exemption as relates to the Chase Box, wherein Shannon attested that the "entire cash contents" of the Box were her property, Noga explained that Shannon knows the money is from their father and is supposed to be used for her wedding.  Because the box is in Shannon's name as well, she also filed a claim.  Noga believed she was entitled to claim the Box exempt from Plaintiffs' judgment levy because she was not a judgment debtor and the Box was not Yoram's property.

Noga was shown the bank record of when the safe deposit box was accessed, and she agreed it shows visits by her in July, August, and September 2015, all before the bank levy. She also agreed that it shows that Shannon accessed the Box in June 2015.  Defendant's Trial Ex. L.   Although Noga first stated did not remember if she attempted to access the Box after the 2016 levy, she did testify that if she could have

accessed the Chase Box, she might have tried, even though there was a court ordered bank levy on it.  After the levy, bank records show that she tried to access it and was denied.

Plaintiffs argue that the timing of the opening of the Chase Box, approximately two years after receiving Shannon's bridal fund, around the time that Plaintiffs began to enforce the Superior Court Judgment, supports their argument that the money is from Yoram and is too coincidental to be explained otherwise.  Noga testified that she held Shannon's bridal fund, in cash, in her home until March 2015, when she opened the Chase Box.  She explained that there had been robberies in their neighborhood around the same time, and she no longer felt safe keeping her jewelry and Shannon's bridal fund in the Vanalden Property.  The Box is located within a few miles of where she and Yoram live.  Noga explained that she did not want to open a bank account for those funds because they did not belong to her, so she kept them in the Box with her jewelry.

The Court is faced with two competing narratives: in one, Yoram and Noga masterminded a scheme in which Yoram siphoned off funds from his entities, turned the cash over to Noga, who then concealed the cash in the Box to use to fund their joint family expenses; in the other, Noga opened the Box to hold the money given to her by her father for her sister's bridal fund, without regard to Yoram's legal troubles.  Without a greater evidentiary showing from Plaintiff to support the series of inferences that the Chase Box funds are Debtor's property, the Court has difficulty finding concealment by Debtor as it relates to the Chase Box.  First, despite reams of records from Ban-V and Mika-El, very little summary financial or audit evidence was presented showing that they actually had cash beyond what the parties were spending on themselves and business expenses during the operation of the business. It appears most likely that the losses Plaintiffs had went to business expenses or cash spent on lifestyle during the years the business operated. There had been years of litigation where the Talasazans paid lawyers and living expenses, and they may well have used funds taken from the companies originally, but there was little basis to conclude there were funds left years later, especially when the bankruptcy was filed.

Plaintiff did not trace the cash contained within the Box to money Yoram concealed from Plaintiff in their joint ventures in any understandable way. While tracing cash is inherently difficult, the arguments about what expenditures or diversions likely went into the box were confusing and never amounted to the substantial sum kept in the box.  Plaintiff did not subpoena Shannon or her father, Mr. Lahiji.  Instead, Plaintiff wishes the Court to make the inference that the money on which the Superior Court Judgment is based is in the Chase Box. Despite the fact that Noga's explanation is odd, the evidence does not support such a leap where Plaintiff has the burden of proof.  In the PMA in 2004, Noga admitted to having three bank accounts, the balances of which totaled more than $227,000.  Defendant's Ex. G, Bates no. 0453.  Her pre-marital practice of keeping accounts with balances of this size and entering into an earlier real estate purchase with her sister, lends support for Noga's position that she would have this amount of cash held for her family, in joint possession with Shannon.

Both Yoram and Noga appear to have operated under the belief that the contents of the Box were Noga's separate property, either as her own jewelry or held for the benefit of her sister.  Chase's records show that Yoram never actually visited the Box. While Noga's testimony was self-serving, the funding of the Chase Box was Noga's obvious, somewhat legally dubious, solution to protecting Shannon's bridal fund from what she believed to be a wrongful levy by Plaintiff for Yoram's debts. It also appears to have been a Lahiji family effort to keep the funds away from Yoram's failing business ventures. That sum of money would likely have been spent in the intervening years between the business failing and the bankruptcy had it been available to Yoram. While neither explanation for the cash in the Box seems satisfactory, Plaintiffs' explanations seem less likely, given the totality of the evidence, and they had the burden of proof.

### III. Transfer of Assets to Lucki, Inc.

Plaintiffs also allege that Yoram concealed the true value of, and income derived from Lucki, Inc., one of the companies he started after Ban-V collapsed.  Plaintiffs argue that Yoram shifted goods from Ban-V to Lucki in an attempt to transfer or conceal property with the intent to hinder, delay or defraud.  The transfers identified in the State Court Judgment occurred far outside the one-year lookback period of § 727(a)(2)(A).

SoD, 15-16. Talasazan started doing business as Lucki by 2012, but the bankruptcy was not filed until 2016.

Plaintiffs also offered McGinn's testimony to show that Defendant continued this practice of taking funds from his entities that should be estate assets. On or about November 7, 2015, McGinn went to Talasazan's business premises on Long Beach Blvd as part of her investigation.  She never got inside but took photos of the outside of the building. She spoke to Yoram and watched him outside.  McGinn described five men surrounding  her, intimidating her and filming her.  She identified Petel and Yoram as members of the five and felt very threatened by them. They would not let her go inside the warehouse and see what companies Yoram was operating. McGinn Depo., 76:22 – 83:17.  While the evidence is that Yoram works at the location and was threatening to McGinn, exactly the extent of his business is not clear.

Petel testified that he is also in the clothing distribution business and visited the warehouse where the new business was being run. He minimized Talasazan's involvement at the building, stating that it is a big warehouse with lots of vendors. He has seen Talasazan sitting at a desk in a part of the warehouse and assumed he is leasing that space.

Talasazan admits running a new clothing business called Lucki and paying some rent for a desk at the warehouse. The inventory of whatever close-out clothing was present at the crash of Ban-V and Mika-El in 2010 was never shown to be in existence at the time of the 2016 bankruptcy filing. Yoram clearly remained in the clothing resale business, but whether he did so with the previous company's inventory seems speculative. The evidence shows that Talasazan is in a similar business but does not show that he has transferred assets from the previous business or is concealing a business worth more than he claimed on his schedules. There is no prohibition on being in the same business as one was before bankruptcy; the prohibition is against transferring assets out of the earlier business or concealing the value of the business.

Plaintiff is understandably quite upset at his failure to collect his judgment against Yoram where Noga has assets from which he can collect. Plaintiff sued Noga as well in the Superior Court, and she remained a named defendant through trial.  The Superior

Court found in her favor, and she is not liable on Yoram's judgment.  The inferences Plaintiff wishes the Court to draw about Yoram's obfuscations and the shortfall of income compared to expenses can be just as plausibly explained by Yoram's poor business practices.

## 11 U.S.C. § 727(a)(4)(A) - False Oath

To bring a successful objection to a Chapter 7 discharge on grounds of a false oath, a plaintiff must show, by a preponderance of the evidence, that (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently.  Retz v. Samson (In re Retz), 606 F.3d 1189 (9th Cir. 2010); Hansen v. Moore (In re Hansen), 368 B.R. 868, 872 (BAP 9th Cir. 2007).  Intent under § 727(a)(4) may be established by circumstantial evidence, or by inferences drawn from a course of conduct. Id. A debtor acts knowingly if he or she acts deliberately and consciously.  Retz, 606 F.3d at 1193 (9th Cir. 2010). A false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent. See 6 Collier on Bankruptcy, ¶ 727.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

Section 727(a)(4)(A) requires that the relevant false oath relate to a material fact. Id. (citing In re Roberts, 331 B.R. at 882). "A fact is material 'if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property'." Id., (citing In re Khalil, 379 B.R. at 173). An omission or misstatement that "detrimentally affects administration of the estate" is material. Id. at 1198 (citations omitted).

Moussighi argues in paragraph 72 of the First Amended Complaint, ad. ECF No. 17, that Debtor's schedules "failed to disclose the existence of his assets, including the gold, jewelry and cash of more than $200,000 located in his wife's safe deposit box." He also alleges as false the value of Lucki as $3,000, the income from Lucki, and Debtor's expenses, specifically the childcare and education expenses.  He also alleges the Debtor falsely claimed to be separated from his wife. As discussed earlier, the value of Lucki was never proven, and the Chase Box is not Yoram's. Both parents seem to take turns funding the children's education and childcare, as funds are available, and

inconsistency over time on such an item does not indicate fraudulent intent. There is no evidence contradicting their claims that they have reconciled after the dissolution action was filed.

Moussighi alleged that Talasazan lied about whether Shannon was Noga's cousin or sister. It is not clear whether Talasazan misstated the relationship between Noga and Shannon due to language or translation difficulties, but the difference is not material. He also alleged that Debtor changed the amount he gave Shannon for rent from $200 to $300 month, and then said never gave her any money. There were also confusing allegations about how Yoram changed his testimony about what he paid to rent the desk at the warehouse.

These alleged false statements needed to be alleged clearly in the complaint, and at the very least, in the pretrial stipulation. A false statement under § 727(a)(4) is perjury and cannot be a fuzzy moving target, as these allegations were at trial.  The difference in what Talasazan answered in different examinations is also problematic because it is not clear what period of time was being asked about and how it was material in this Chapter 7.  Section 727(a)(4)(A) is focused on false *material* statements that detrimentally affect the bankruptcy estate. While materiality is generally a fairly low standard, nominal differences in business expenses in a no asset Chapter 7 do not affect creditors.  Plaintiffs appear to be correct that Talasazan does not go out of his way to check the accuracy of what he says, but Plaintiffs confuse the requirements of § 727 with honesty in general or honesty in an earlier trial.  The false statement cause of action was not proven.

//

//

//

//

//

//

-42-

**Conclusion**

Judgment is for Plaintiffs under § 523(a)(4).  Damages of $779,841 are not discharged. That amount is made up of $298,091, with interest at the rate of 10% per annum running from August 1, 2008, <u>SoD</u>, 7:25-8:1, and $481,750, with interest at the rate of 10% per annum from March 24, 2009, <u>SoD</u>, 10:3-5.  <u>See</u> <u>Hamilton</u>, <u>supra</u> at 324 (state post-judgment interest rate continues to accrue post-petition on a nondischargeable debt).

Judgment is for Defendant under all § 727 causes of action. The Court will issue a judgment consistent with this ruling.

<div align="center">###</div>

Date: December 1, 2021

Maureen A. Tighe
United States Bankruptcy Judge